**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Timonthy Yanahan,

        Plaintiff,

    v.

Wells Fargo Bank, N.A.,

        Defendant.

Case No. 24-cv-1042

Hon. Mary R. Rowland

**FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff Timonthy Yanahan, by and through his counsel, James C. Vlahakis, and submits the following First Amended Complaint against Defendant Wells Fargo Bank, N.A.:

## I. **Parties, Jurisdiction and Venue**

1. Plaintiff Timonthy Yanahan ("Plaintiff") is a citizen and resident of the State of Illinois and resides in this judicial district.

2. Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") is a Delaware registered corporation, with a principal place of business located in San Francisco, California.

3. "[D]istrict courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between — (1) citizens of different States[.]" 28 U.S.C. § 1332.

4. Plaintiff seeks over $75,000 in compensation (exclusive of attorney's fees and costs) as a result of Defendant's unlawful conduct.

5. Based upon Plaintiff's citizenship and domicile (Illinois) and the citizenship of Defendant (Delaware), diversity of citizenship exists.

6.     Venue in this judicial district is proper because Defendant maintains business locations in this judicial district, the complained of conduct took placed within this judicial district and all material witnesses to the complained of conduct work for Defendant within this judicial district.

## II.     **Background Allegations**

7.     Plaintiff took out a mortgage with Defendant for a property located in the City of Chicago at 6204 South Keating (hereafter the "Residence") under Loan ID # 708/0135727147 ("Mortgage Loan").

8.     Plaintiff defaulted on his Mortgage Loan.

9.     Thereafter, Plaintiff sought the assistance of Defendant to help him reduce the monthly payments of his Mortgage Loan.

10.     Defendant attempted to assist Plaintiff by having him participate in "Home Affordable Mortgage Program" ("HAMP"), found at P.L. 110-343, 122 Stat. 3765.

11.     HAMP was created in response to the massive spike in default and foreclosure rates in 2008. HAMP was enacted to balance the financial interests of borrowers and lenders/investors.

12.     The centerpiece of HAMP involved the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." 12 U.S.C. § 5219(a).

13.     Congress also granted the Secretary the authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.*

14.     In February of 2009, the Treasury Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure.

15.     In particular, the Treasury Secretary negotiated Servicer Participation Agreements ("SPAs") with dozens of home loan servicers, including Wells Fargo.

16.     Under the terms of these SPAs, home loan servicers like Wells Fargo agreed to identify homeowner who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program.

17.     As an incentive to home loan servicers like Wells Fargo, for every borrower whose loan was successfully modified, the Treasury Department would pay the servicer $1,000 up front and $1,000 annually for up to five years thereafter, so long as the borrower remained current.

18.     Wells Fargo agreed to participate in the HAMP program in or around March of 2010, executed a SAP and agreed to comply with certain Treasury regulations.

19.     The SPAs stated that servicers "shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . issued by the Treasury."

20.     Under HAMP and its various regulations, Wells Fargo was required to consider delinquent borrowers for a HAMP modification before proceeding with foreclosure.

21.     Under HAMPS, a borrower/homeowner could qualify for a HAMP modification if a modification served the financial interests of their lender.

22.     HAMP directed lenders to evaluate loan modification requests using a formula that assessed whether the financial return for investors from a modification was superior to the anticipated financial outcome of foreclosure proceedings.

23.     To qualify for such a loan modification under HAMP, a borrower had to meet certain criteria.

24.     For example, a borrower had to (a) have a first lien mortgage loan, (b) the loan had to be in default, (c) the borrower had to document financial hardship, and (d) the borrower's pre-modification monthly housing payment had to exceed 31 percent of their income.

25.     Plaintiff satisfied all of the four criteria set forth in the above paragraph. Where (a) his Mortgage Loan was a first lien mortgage loan, (b) his Mortgage Loan was in default, (c) Plaintiff was able to document a financial hardship, and (d) the Plaintiff's pre-modification monthly housing payment exceeded 31 percent of his then income.

26.     If a borrower met these requirements and submitted certain paperwork, a sequential series of reductions would be applied to the mortgage loan until the payment was equal to or less than 31 percent of the borrower's income.

27.     Under this process, servicers would first capitalize the past due balance, then lower the interest rate, then extend the remaining term up to 480 months, and finally would reduce or defer the principal balance until it produced a monthly payment that was less than 31 percent of the borrower's gross income.

28.     Plaintiff applied for a mortgage modification under the to reduce Plaintiff's monthly payments.

29.     Pursuant to HAMP, Wells Fargo offered Plaintiff certain loan modifications.

30.     Thereafter, Plaintiff executed paperwork to obtain at least two loan modifications.

31.     Unbeknownst to Plaintiff, a calculation error in the software application that Wells Fargo used to determine eligibility for loan modifications - called the "Home Preservation Application Tool" ("HPA Tool") - caused Wells Fargo to *erroneously* deny trial loan modifications for a number of borrowers facing foreclosure.

32.     Plaintiff's proposed loan modifications were incorrectly calculated because of the errors programed into Defendant's HPA Tool.

33.     Plaintiff would have obtained a proper loan modification if Defendant had properly tested and audited its HPA Tool.

34.     Upon information and belief, Defendant never tested its HPA Tool to confirm that it was properly calculating loan modifications.

35.     Upon information and belief, Defendant never performed an audit of its HPA Tool to confirm that it was properly calculating loan modifications.

36.     Plaintiff's proposed loan modifications were also negatively impacted by the fact that Defendant repeatedly s "shuffled" his loan modification paperwork among numerous employees who were inexperienced and inept.

37.     The "shuffling" of loan modification paperwork among the numerous employees led to Plaintiff having to resubmit countless documents – essentially requiring Plaintiff to restart each loan modification from scratch.

38.     On more than one occasions, Plaintiff's loan modification paperwork was lost by inept staff.

39.     Compounding the above errors, Plaintiff received loan modification paperwork for another Wells Fargo customer.

40. In summary, Wells Fargo employed unqualified customer service employees and failed to train them to properly implement HAMP effectively, which prevented Plaintiff from obtaining a proper loan modification.

41. Wells Fargo also adopted certain policies that effectively sabotaged Plaintiff's participation in the HAMP modification process, such as limiting borrowers to only one telephone call with any given employee, effectively requiring borrowers to start from scratch with an unfamiliar agent in any follow-up calls.

42. In summary, Wells Fargo deliberately implemented a loan modification system designed to wrongfully deprive its eligible borrowers (like Plaintiff and thousands of others) of an opportunity to modify their mortgages as intended by HAMP.[1]

43. As a result of these various issues, the proposed modifications only resulted in a slight reduction of the monthly payments, with an approximate reduction of $150 in monthly payments.

44. As a result of the calculation error in the software application Wells Fargo, Plaintiff was offered inaccurate loan modifications, where each proposed modification was more expensive than they should have been.

45. Simply stated, but for Wells Fargo's calculation errors, Wells Fargo would have proposed an affordable loan modification.

46. As a result of the calculation error in the software application Wells Fargo used, Plaintiff was never provided with properly reduced loan modifications.

47. As a result of the calculation error caused by the HPA Tool and the other issues identified above, Wells Fargo foreclosed on the Residence.

---

[1] Plaintiff recognizes that HAMP itself does not provide a private right of action. See Def's Memo. of Law a p. 4 (Dkt. 14). Rather, Plaintiff is pointing to Defendant's violation of HAMP to support Defendant's violations of ICFA. See, e.g., Count III of this First Amended Complaint.

48.     When Wells Fargo entered into the underlying mortgage with Plaintiff the Residence was valued at $227,000.

49.     Additionally, Wells Fargo failed to properly value the Residence, where the Residence was situated on an extra-long lot.

50.     At the time the Residence was sold, the land itself was worth $100,000.

51.     Wells Fargo, however, sold Plaintiff's home for $91,000, far less than its then-present value.

52.     If Defendant has properly calculated the proposed loan modification, Plaintiff would not have been foreclosed upon and he would have remained at his Residence, where the Residence would have increased in value over time.

53.     As a result of the calculation error in the software application Wells Fargo used, Plaintiff suffered compensatory damages in the form of legal fees, additional taxes resulting from the *improper* issuance of an IRS form 1099-C, anxiety, emotional distress and health related complications.

54.     After Wells Fargo learned of its calculation error, it offered Plaintiff $15,000 in compensation.

55.     As an incentive to cause Plaintiff to enter into mediation, Plaintiff was told that agreeing to mediation would not result in Plaintiff "waiving any legal claims" that he would have against Wells Fargo. As a further incentive to cause Plaintiff to agree to mediation, Wells Fargo informed Plaintiff that it would not raise any statute of limitations defense.

56.     Thereafter, the parties mediated before the Honorable Susan Zwick of JAMS, but were unable to resolve the mediation.

57.     Certain statutes of limitations were tolled by the filing of a prior putative class action against Defendant, which took place on December 5, 2028. *See,*

*Hernandez v. Wells Fargo, N.A.*, 18-cv-07354 (N.D. Cali.) (hereafter *Hernandez v. Wells Fargo*). As explained below, the filing of *Hernandez v. Wells Fargo* tolled the running of the various statutes of limitation. *See, e.g.,* A*merican Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974). The Court may take judicial notice of this filing date, as reflect by the first page of the *Hernandez* class action complaint:



58.     Under *American Pipe & Construction Co. v. Utah*, the filing of a putative class action in federal court tolls the statute of limitations for all putative class members' individual claims that the prior class action also asserted against the same defendant. 414 U.S. at 553. "The purpose of tolling is to encourage putative class members to rely on a class action in which they reasonably expect to obtain relief rather than filing individual suits[.]" *Kelly v. Cap. One, N.A.*, 717 F. Supp. 2d 805, 807 (E.D. Wis. 2010).

59.     The court in *Hernandez v. Wells Fargo* granted preliminary approval of a putative class action on January 29, 2020. *See, Hernandez v. Wells Fargo*, 2020 U.S. Dist. LEXIS 15844, 2020 WL 469893 (N.D. Cali. Jan. 29, 2020). In particular, the district court granted preliminary approval of the following defined class:

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

2020 U.S. Dist. LEXIS 15844 at *18 (hereafter the "Proposed Class Definition").

60.     The court in *Hernandez v. Wells Fargo* <u>denied</u> "certification of various state subclasses for violations of their respective state consumer protection laws." *Id.* at *17. According to the court's rationale, "[t]he state consumer laws here are materially different. Common issues would not predominate and accordingly, certification of the state subclasses is DENIED." *Id.*

61.     The court in *Hernandez v. Wells Fargo* also <u>denied</u> certification of a proposed class seeking compensation for intentional infliction of emotional distress. *Id.* at *16. According to the court:

> Determining whether conduct is outrageous is not only dependent on each state's laws (which vary widely), but also on the facts and circumstances of each individual putative class member. Hypothetically, one putative class member could be an impoverished individual who attempted to make her mortgage payments, and was wrongfully denied a mortgage modification, while another putative class member could have repeatedly failed to make his mortgage payments due to negligence, but was also denied a mortgage modification. Defendant's conduct could be considered outrageous in one situation and not the other. Such individualized inquiries greatly undermine commonality and defeat class certification. The motion for certification of a nationwide class as to the issue of whether defendant's conduct was "outrageous" is thus DENIED.

*Id.* at *16-*17.

62.     As noted above, the filing of the putative class action claims in *Hernandez v. Wells Fargo* tolled the running of the statute of limitations for Plaintiff until the date of the district court denying (in part) and granting (in part) certification. *See, e.g., China Agritech, Inc. v. Resh*, 584 U.S. 732, 739, 138 S. Ct. 1800, 201 L. Ed. 2d 123 (2018); A*merican Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974). Plaintiff *excluded* himself from the *Hernandez* class action settlement.

63.     On October 12, 2020, the district court granted final approval of the class action settlement, where the court recognized that information provided by Wells Fargo identified 870 class members:

> The background of this action has been set forth in prior orders and need not be discussed in detail herein (*see* Dkt. Nos. 87, 217). In brief, plaintiffs had their mortgage loans serviced by defendant Wells Fargo Bank, N.A. Although plaintiffs met the Home Affordable Modification Program (HAMP) requirements, the bank failed to offer them loan modification and/or repayment plans due to an algorithmic error in its system that caused certain fees to be misstated, which then resulted in incorrect mortgage modification denials. As a result, between 2010 and 2018, the bank denied trial loan modifications to approximately 870 homeowners who should have qualified but were deemed unqualified as a result of the error in the bank's system. Over 500 of those homeowners then lost their homes in foreclosures.

*See*, *Hernandez v. Wells Fargo*, 2020 U.S. Dist. LEXIS 188669, *2-*3 (N.D. Cali. Oct. 12, 2020). The court's certification order does not reconcile how notice of the proposed settlement was sent to just 510 class members. *Id.* at *6.

64.    Thereafter, on July 26, 2021, the court in *Hernandez v. Wells Fargo*, revisited its certification order, and granted preliminary approval of additional relief, where the putative class representatives asked the court to "address 741 class members who fell within the class definition in the original class settlement agreement, *but were not part of the original list of borrowers provided by Wells Fargo and identified in the class list submitted to the Court after final approval of the original settlement*." *Hernandez v. Wells Fargo*, 18-cv-07354, 2021 U.S. Dist. LEXIS 138889, *2 (N.D. Cali. July 26, 2021) (Emphasis added). Simply stated, the court's July 26, 2021, order granted certification of the additional class members that Well Fargo had failed to properly recognize when it identified class members impacted by the calculation error at issue.

65.    Accordingly, where the district court partially denied certification on January 29, 2020, Plaintiff's claims are not time barred. Rather, while Defendant wrote to Plaintiff on September 24, 2018, to alert him of its software error, the filing of the *Hernandez v. Wells Fargo* class action on December 5, 2018, served to toll the five-year statute of limitations that apply to Plaintiff's promissory estoppel and fraudulent misrepresentation claims. Assuming for the sake of argument that Plaintiff received Defendant's September 24, 2018, letter by September 28, 2018, only 68 days passed before tolling applied. Certification in *Hernandez v. Wells Fargo* was partially denied on January 20, 2020, which *tolled* the applicable statute of limitations for approximately 13 and a half months.

66.     This suit was filed on February 6, 2024, approximately four years and 17 days after certification was denied in *Hernandez v. Wells Fargo*. When added together, after counting the time period tolled by *Hernandez v. Wells Fargo*, more than four years and 82 days have run. Accordingly, it is clear that the five-year statute of limitations that apply to Plaintiff's promissory estoppel and fraudulent misrepresentation claims *has not run*.

67.     As for Plaintiff's ICFA claim, which is governed by a three-year statute of limitations, Plaintiff is entitled to equitable tolling where Wells Fargo prevented him from obtaining key information until certain discovery came to light in a class action involving the software error at issue. A party is entitled to equitable tolling if they pursued their rights in a diligent manner and extraordinary circumstance prevented timely filing. *See, Holland v. Florida*, 560 U.S. 631, 649, 130 S. Ct. 2549, 177 L. Ed. 2d 130 (2010). While Wells Fargo wrote to Plaintiff on September 24, 2018, to describe how it he was wrongfully denied a loan modification, Defendant's letter failed to describe the true circumstances of the reasoning behind the denial of Plaintiff's loan modification. Dkt. 15-1, which is a true and accurate copy of the September 24, 2018, letter (minus the attached additional paperwork), simply states that Plaintiff's loan modification was denied "based ... on a faulty calculation"[.]

68.     Plaintiff attempted to mediate with Wells Fargo and without going into too much detail about what was said during the mediation, the mediator made a settlement recommendation that was not accepted by Wells Fargo. When the mediation was not resolved, Plaintiff was entitled to rely on the prosecution of the putative class action in *Hernandez v. Wells Fargo*. The district court in that case denied in part and granted in part certification on January 20, 2020. Ultimately, however, Wells Fargo (for whatever reasons) *underestimated* the initial class size – and

a *second* certification order was entered which *expanded* the size of the original class. While certification orders can always be modified by court order (see, FRCP 23(c)(1)(C)), the fact that the class was grossly *underestimated* supports a finding of equitable tolling. Further, equitable tolling applies where (upon information and belief), recordings of telephone conversations between Plaintiff and various employees of Wells Fargo were not preserved during the pendency of *Hernandez v. Wells Fargo* – or in relation to the prior mediation between Plaintiff and Wells Fargo and Plaintiff's decision to opt-out of the proposed class action settlement in *Hernandez v. Wells Fargo*.

69.     Further, equitable estoppel applies where – as asserted above - Defendant indicated that it would not assert a statute of limitations defense.

70.     In addition to the software error that caused Plaintiff's loan modification to be properly calculated, Plaintiff was *incorrectly* advised by one or more employees of Defendant that he would need to default on his payments for him to be considered for a loan modification. This representation was false and Plaintiff relied upon this misrepresentation – which caused him to default on his loan payments – when he would have otherwise attempted to remain current on his payments.

71.     But for this misrepresentation, Plaintiff would have remained current on his payments and would not have faced a foreclosure proceeding.

72.     Once Plaintiff took the advice he was given, a chain of events unfolded which led to a foreclosure proceeding and an eventual short sale.

73.     Further, paperwork issued by Wells Fargo reflects that Plaintiff was approved for a special forbearance on March 16, 2011, and a Loan Modification on April 21, 2011, but Plaintiff could not satisfy the proposed terms based upon the processing errors that were no fault of his own.

74.     Prior to the above dates, erroneous Loan Modification paperwork was transmitted to Plaintiff on various dates in 2010, all based upon the erroneous software error.

75.     On or about July 12, 2011, and November 21, 2011, additional Loan Modifications were erroneously calculated, where it appears that the same software error impacted the paperwork submitted by Wells Fargo.

76.     Another proposed Loan Modification was proposed in or around March of 2013, where the proposed Loan Modification was admittedly denied based upon the software error.

77.     As noted above, Well's Fargo's foreclosure protection policies ultimately harmed Plaintiff and forced him into foreclosure. But for the misleading representations of Defendant and its software error, Plaintiff should have been given different set of *affordable* loan modifications.

78.     Additionally, Wells Fargo wrote to Plaintiff on March 21, 2019, where it referred to its "recent mediation session." In this letter, Wells Fargo offered to provide Plaintiff with additional compensation, *without* advising him of the putative class action involving Hernandez v. Wells Fargo.

## COUNT I - Breach of Contract

79.     Plaintiff realleges and incorporates Paragraphs 1 through 78 as if fully set forth in this Count.

80.     As set forth above, Plaintiff exchanged and executed paperwork with Defendant and obtained numerous erroneous loan modifications that did not significantly reduce his monthly mortgage payments. In exchanging and executing this paperwork with Wells Fargo, Wells Fargo made a concrete offer to Plaintiff which Plaintiff performed all that was required by him.

14

81.    As a result of the calculation error in the software application that Wells Fargo used, Plaintiff was offered inaccurate loan modifications, where the proposed modifications were *more expensive* than they should have been.

82.    But for Wells Fargo's calculation errors, Plaintiff would have received a more affordable loan modification.

83.    As a result of the calculation error in the software application Wells Fargo used, Plaintiff was never provided with properly reduced loan modifications.

84.    As set forth above, Defendant failed to carry out its contractual obligations that it owed to Plaintiff.

85.    As a result of the calculation error within Defendant's HPA tool and the other errors and omissions identified, Wells Fargo foreclosed on the Residence.

86.    As a result of Defendant's conduct, and Plaintiff's performance of what was required of him, Defendant breached the proposed terms and Plaintiff suffered damages and lost his home to foreclosure, among other damages.

WHEREFORE, Plaintiff requests judgment be entered against Defendant as follows:

      a.  Compensatory damages;

      b.  Punitive damages allowable by law;

      c.  Pre-judgment and post-judgment interest; and

      d.  Costs and reasonable attorneys' fees.

### COUNT II – Promissory Estoppel

87.    Plaintiff realleges and incorporates Paragraphs 1 through 78 as if fully set forth in this Count.

88.    Promissory estoppel is an alternative means of obtaining contractual relief under Illinois law.

89.     For example, promissory estoppel makes a promise binding where all the other elements of a contract exist, but consideration is lacking.

90.     The doctrine of promissory estoppel is "commonly explained as promoting the same purposes as the tort of misrepresentation: punishing or deterring those who mislead others to their detriment and compensating those who are misled." Avery Katz, *When Should an Offer Stick? The Economics of Promissory Estoppel in Preliminary Negotiations*, 105 Yale L.J. 1249, 1254 (1996).

91.     To establish the elements of promissory estoppel, "the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009).

92.     Here, as set forth above, Defendant made unambiguous promises to Plaintiff, (2) Plaintiff relied on Defendant's promise, (3) Plaintiff's reliance was expected and foreseeable, and (4) Plaintiff relied on Defendant's promises to his detriment.

93.     As a result of Defendant's conduct, Plaintiff has suffered economic and non-economic harm.

WHEREFORE, Plaintiff requests judgment be entered against Defendant as follows:

   a.  Compensatory damages;

   b.  Punitive damages allowable by law;

   c.  Pre-judgment and post-judgment interest; and

   d.  Costs and reasonable attorneys' fees.

## **COUNT III - Illinois Consumer Fraud and Deceptive Business Practices Act**

94.    Plaintiff realleges and incorporates Paragraphs 1 through 78 as if fully set forth in this Count.

95.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

96.    Plaintiff's proposed loan modifications were incorrectly calculated because of the errors programed into Defendant's HPA Tool.

97.    Plaintiff would have obtained a proper loan modification if Defendant had properly tested and audited its HPA Tool.

98.    Upon information and belief, Defendant never tested its HPA Tool to confirm that it was properly calculating loan modifications.

99.    Upon information and belief, Defendant never performed an audit of its HPA Tool to confirm that it was properly calculating loan modifications.

100.    Further, Defendant falsely indicated that its loan modification process was staffed by well-educated and trained staff, when the above allegations show that this was not the case.

101.    For example, Plaintiff's proposed loan modifications were negatively impacted by the fact that Defendant repeatedly s "shuffled" his loan modification paperwork among numerous employees who were inexperienced and inept.

102.    The "shuffling" of loan modification paperwork among the numerous employees led to Plaintiff having to resubmit countless documents – essentially requiring Plaintiff to restart each loan modification from scratch.

103.    On more than one occasions, Plaintiff's loan modification paperwork was lost by inept staff.

104.    Compounding the above errors, Plaintiff received loan modification paperwork for another Wells Fargo customer.

105.    In summary, Wells Fargo employed unqualified customer service employees and failed to train them to properly implement HAMP effectively, which prevented Plaintiff from obtaining a proper modification.

106.    Defendant's above conduct was deceptive and took place in the course of conduct involving trade and/or commerce.

107.    In particular, Defendant's failure to properly evaluate Plaintiff for a HAMP modification offended public policy.

108.    Defendant intended Plaintiff to rely on its deceptive actions, and Plaintiff was damaged as a result of Defendant's conduct.

109.    "A practice offends public policy under ICFA where it violates statutory or administrative rules establishing a certain standard of conduct." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 630 (N.D. Ill. 2019) (quotation marks omitted).

110.    "Violations of agency directives" like those implementing HAMP "can be a hallmark of unfairness under the ICFA." *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 753 (N.D. Ill. 2011) (violating HAMP directives states a claim under ICFA).

111.    Further, "[f]ailure to honestly and effectually implement HAMP guidelines constitutes an unfair business practice under the ICFA." *Bank, N.A.*, No. 15-cv-4433, 2016 WL 4593815, at *7 (N.D. Ill. Sept. 2, 2016).

112.    Defendant's collective conduct was immoral, unethical, oppressive, and/or unscrupulous.

113.    "[A] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on

the consumer." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 631 (N.D. Ill. 2019) (quotation marks and citation omitted).

114. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered economic and non-economic harm.

WHEREFORE, Plaintiff requests judgment be entered against Defendant as follows:

    a. Compensatory damages;

    b. Punitive damages allowable by law;

    c. Pre-judgment and post-judgment interest; and

    d. Costs and reasonable attorneys' fees.

## COUNT IV – Fraudulent Misrepresentation

115. Plaintiff realleges and incorporates Paragraphs 1 through 78 as if fully set forth in this Count.

116. As set forth above, with regard to the PTA Tool, Defendant made false statements of material fact that it knew were false when the statements were made, where the statements were made to induce Plaintiff to attempt to negotiate a lower monthly loan payment.

117. Plaintiff's proposed loan modifications were incorrectly calculated because of the errors programed into Defendant's HPA Tool.

118. Plaintiff would have obtained a proper loan modification if Defendant had properly tested and audited its HPA Tool.

119. Upon information and belief, Defendant never tested its HPA Tool to confirm that it was properly calculating loan modifications.

120. Upon information and belief, Defendant never performed an audit of its HPA Tool to confirm that it was properly calculating loan modifications.

121.    Further, Defendant falsely indicated that its loan modification process was staffed by well-educated and trained staff, when the above allegations show that this was not the case.

122.    For example, Plaintiff's proposed loan modifications were negatively impacted by the fact that Defendant repeatedly s "shuffled" his loan modification paperwork among numerous employees who were inexperienced and inept.

123.    The "shuffling" of loan modification paperwork among the numerous employees led to Plaintiff having to resubmit countless documents – essentially requiring Plaintiff to restart each loan modification from scratch.

124.    On more than one occasions, Plaintiff's loan modification paperwork was lost by inept staff.

125.    Compounding the above errors, Plaintiff received loan modification paperwork for another Wells Fargo customer.

126.    In summary, Wells Fargo employed unqualified customer service employees and failed to train them to properly implement HAMP effectively, which prevented Plaintiff from obtaining a proper modification.

127.    Plaintiff acted to his detriment by relying on Defendant's false statements by not seeking alternative methods to save his home from foreclosure.

128.    As a result of Defendant's conduct, Plaintiff has suffered economic and non-economic harm.

WHEREFORE, Plaintiff requests judgment be entered against Defendant as follows:

      a.   Compensatory damages;

      b.   Punitive damages allowable by law;

      c.   Pre-judgment and post-judgment interest; and

    d.  Costs and reasonable attorneys' fees.

## **Jury Demand**

Plaintiff demands a jury trial as to all applicable causes of action.

_/s/ James C. Vlahakis_
James C. Vlahakis
**Vlahakis Law Group LLC**
20 N. Clark Street, Suite 3300
Chicago IL 60602
312-766-0511 (office)
312-648-6127 (direct)
jamesv@vlahakislaw.com